<u>FOR PUBLICATION</u>

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CARL LASSITER,** | |
| **Plaintiff,** | **CIVIL ACTION** |
| **v.** | **NO. 14-1037** |
| **THE CHILDREN'S HOSPITAL OF PHILADELPHIA,** | |
| **Defendant.** | |

## <u>OPINION</u>

Plaintiff Carl Lassiter brings this action against his former employer, Defendant Children's Hospital of Philadelphia ("CHOP"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101 *et seq.* ("ADA"); and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA").[1]  Lassiter claims that CHOP wrongfully terminated him based on his race (African American) and disability (back injury), and in retaliation for his prior, and ultimately unsuccessful, race discrimination lawsuit against the hospital.

Before the Court is CHOP's Motion for Summary Judgment.  CHOP seeks judgment in its favor on all of Lassiter's claims against it on the ground that there exist no issues of genuine maternal fact because Lassiter was terminated for poor performance.

---

[1] Lassiter also originally brought claims of age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, and the PHRA.  However, in his Response in Opposition to Defendant's Motion for Summary Judgment, Lassiter voluntarily withdrew these claims.  Opp'n at 2 n.1.

## I.      BACKGROUND

### A.      *Factual History*

#### 1.      **Lassiter's Employment History with CHOP**

Carl Lassiter, who is African American, began working at CHOP in February 1983 as a Medical Technologist and was promoted to Senior Medical Technologist in 2005.  Joint Appendix ("J.A.") 1, 380-86.  Shortly after his promotion, he and six other African American employees filed a race discrimination lawsuit against CHOP.  J.A. 14-30.  In that lawsuit, he complained that he was not promoted to the supervisor position in Central Laboratory Services ("Central Lab") because of his race.  J.A. 38-39.  On January 31, 2008, summary judgment was entered in favor of CHOP and against Lassiter on all claims.  J.A. 62-96.[2]

During that lawsuit, CHOP engaged a plaintiffs' employment lawyer to conduct an independent investigation into Lassiter's allegations and provide her opinion as to whether those allegations had merit.  J.A. 97-146.  At the conclusion of her investigation, she found: (1) that Lassiter was not the most qualified person for the supervisor job; (2) that his supervisor had been "highly critical of his willingness to 'team' with management and of his generally abrasive and confrontational style in dealing with peers and supervisors"; and (3) that he may have needed an "interim supervisory position to test his leadership and supervisory skills and willingness to form a team with management."  J.A. 116.  CHOP accepted the recommendation and—in the words of CHOP, "[d]espite his documented poor performance"—created the position of Assistant Supervisor of Central Lab specifically for Lassiter.  Mtn. at 5; J.A. 1127; J.A. 153 (Lassiter Dep.); J.A. 685-86 (Carlow Dep.).

Throughout his tenure as Assistant Supervisor, Lassiter received largely positive performance reviews from his supervisor, Vipul Shah.  J.A. 504-05 (Shah Dep.).  His 2008

---

[2]   *See Lassiter v. Children's Hosp. of Phila.*, No. 05-6834, 2008 WL 304891 (E.D. Pa. Jan. 31, 2008).

review, for example, appraised him as "Fully Meets" for his Performance Goals and Responsibilities and as "Fully Effective" for Core Competencies, although he was rated as "partially meets" for multiple categories, including completing projects on time, improving employee relations, and communicating with staff. J.A. 975-90. These positive reviews were forthcoming despite Shah's belief that Lassiter did not perform well as Assistant Supervisor and that he was inefficient in his work, taking longer to complete tasks than necessary. J.A. 504-05 (Shah Dep.). This discrepancy between Lassiter's performance and his performance reviews apparently arose because Dr. Dean Carlow, the Medical Director of Core Laboratory Services, encouraged Shah to give Lassiter higher ratings, and because Shah wanted to help uplift Lassiter and avoid or minimize confrontation with Lassiter. J.A. 519-20 (Shah Dep.).

### 2.     Promotion to Supervisor

When the position of Supervisor of Central Lab became available in 2008, Lassiter applied for the job. J.A. 680 (Carlow Dep.). A "Candidate Evaluation Committee" was responsible for interviewing, evaluating, and ranking the candidates. J.A. 505 (Shah Dep.). Carlow, who was on the committee, testified that there were several applicants and that the committee determined Lassiter was the best candidate for the job (J.A. 680 (Carlow Dep.)), while Shah testified that Lassiter was simply not as weak as the other two candidates. J.A. 506 (Shah Dep.). Shah's view was that Lassiter should not be promoted because he had not been efficient or effective in his job as Assistant Supervisor. J.A. 506 (Shah Dep.). Other members of the committee also expressed reservations about whether Lassiter was the right person to fill the position. J.A. 681 (Carlow Dep.). Nevertheless, with CHOP's HR Department strongly in support, Lassiter was promoted to Supervisor of Central Lab with a one year probationary period, after which his promotion became permanent. J.A. 681-83 (Carlow Dep.).

### 3.     Lassiter as Supervisor

Lassiter's new duties and responsibilities included processing and distributing patient samples for all of the other clinical laboratories at CHOP, ensuring the proper performance of all laboratory procedures with the Central Lab, and supervising and scheduling technologists, technicians, and other related personnel.  J.A. 381; J.A. 888-92.  He reported to both Shah and Carlow.  J.A. 504 (Shah Dep.); J.A. 715-16 (Carlow Dep.).  Shah, in turn, reported to Carlow and to the Administrative Director at the time, John Campopiano.  J.A. 504 (Shah Dep.); J.A. 687 (Carlow Dep.).  Lassiter was the only African American among Shah's direct reports.  J.A. 1106.

As Supervisor, Lassiter had twelve direct subordinates.  His staff was predominantly African American, whereas the other lab staffs were predominately white.  J.A. 165-66 (Lassiter Dep.); J.A. 556 (Shah Dep.); J.A. 585 (Day Dep.); J.A. 614 (Davis Dep.); J.A. 752 (Brown Dep.).  Lassiter believed the Central Lab staff was treated differently because of their race.  J.A. 165-66 (Lassiter Dep.); J.A. 586 (Day Dep.); J.A. 614-15 (Davis Dep.).  More specifically, he believed that Shah held him and his staff to different standards and imposed more restrictions on him than white supervisors and their staffs, that he and his staff were unjustifiably blamed for errors committed by other departments, that he experienced "slights and insults" on a regular basis because of his race, that white managers spoke to him differently than they spoke to white supervisors, and that Campopiano discussed lab matters with white supervisors but not with him, and discussed his areas of responsibility with Shah instead of with him.  J.A. 165-75 (Lassiter Dep.).  He also testified that, as the only African American in attendance at supervisor meetings, he felt that he could not speak in the same way as the white supervisors for fear of being labeled an "angry black man."  J.A. 175 (Lassiter Dep.).

CHOP asserts that Lassiter's performance as Supervisor left much to be desired: He was nonresponsive, he missed deadlines, and he had poor communication and management skills. J.A. 276-91; J.A. 706, 709-10, 711 (Carlow Dep.). For example, despite reminders from Shah, Lassiter was either late in completing his staff's mid-year and annual reviews or did not complete them at all. J.A. 268-80; J.A. 185-88, 191-92 (Lassiter Dep.). Lassiter also ignored the requests of other managers, supervisors, nurses, and administrators: for example, he admitted in his deposition that he routinely ignored Barbara Harris, another department supervisor. J.A. 281-88; J.A. 171-72, 189, 195, 222 (Lassiter Dep.). And, on one occasion in 2010, a nurse relayed to numerous directors at CHOP that Lassiter, as Supervisor of Central Lab, was contacted about a missing patient specimen and never responded to the request for assistance in locating the specimen. She wrote:

> We have a very hard time getting timely responses from Carl. There are many times when we need certain tubes sent to us from the lab. Most of the time we don't get a response and need to follow up with multiple requests. Then sometimes we are sent the wrong tubes days or weeks later.

J.A. 286.

One of Lassiter's duties was to prepare monthly send-out reports ("SO Reports") and miscellaneous send-out reports ("MSO Reports"), which identified which laboratory tests were sent from CHOP to outside laboratories and served to ascertain whether certain tests should have been done in-house rather than sending them to outside laboratories or whether CHOP could partner with particular outside labs for certain tests. J.A. 199-201, 219 (Lassiter Dep.); J.A. 644-45 (Toussaint Dep.); J.A. 703 (Carlow Dep.). Even though he knew that timeliness of the reports was important to ensure the information was current and accurate (J.A. 201 (Lassiter Dep.); J.A. 644 (Toussaint Dep.); J.A. 842 (Campopiano Dep.); J.A. 709-10 (Carlow Dep.)), and could also result in significant savings to CHOP and faster results on patient testing (J.A. 182 (Campopiano

Dep.)), Lassiter admitted that he never completed the SO Reports or MSO Reports on time and at one point had accumulated a backlog of nine months of reports.  J.A. 199-200, 219 (Lassiter Dep.); J.A. 645 (Toussaint Dep.); J.A. 201 (Lassiter Dep.) ("Q: So the reports are important, right?  A: Yes, I agree.  Q: And they were your responsibility?  A: Yes."); J.A. 703 (Carlow Dep.) ("The SO and MSO Reports . . . that is one thing Carl was always, always, always really behind on.").  The nine month backlog was cleared—in two days—when Lassiter delegated the responsibility of completing the reports to a subordinate.  J.A. 645 (Toussaint Dep.).

Lassiter's subordinates also had issues with Lassiter's management style, which they raised during their depositions in this matter; some of these complaints also made their way into Lassiter's performance evaluations.[3]

Despite the documented deficiencies, each performance evaluation Lassiter received as Supervisor, reviewed by Shah and Carlow—including his last review, dated August 2011—graded him as "Fully Meets" for Core Competencies, Goals/Job Responsibilities, and as an Overall Rating.  J.A. 1068-77.  In that evaluation, on the topic of "Communication," Lassiter had commented that he was "now using ISBARQ [a method of communication used at CHOP with which he had difficulty] in his communications" and Shah specifically commented, "Big Improvement noted."  J.A. 1068; J.A. 205 (Lassiter Dep.).  In that same evaluation, on the core competencies of "Demonstrates Teamwork" and "Is Accountable," CHOP assigned Lassiter the

---

[3]   J.A. 932 (late SO Reports); J.A. 940 (nonresponsiveness); J.A. 943 (late SO Reports); J.A. 955-56 (same); J.A. 983 ("still need to work on completing CQI reports on time"); J.A. 985 ("need to be mindful of not lecturing and talk[ing] down to staff"); J.A. 994 (poor time management); J.A. 1005 (poor time management and late on deadlines); J.A. 1009-10 (late reports); J.A. 1030 (same); J.A. 1036 (comment that Lassiter "must be careful that conversations do not become too lengthy and remain straight to the point"); J.A. 1038 (poor communication with staff); J.A. 1068-69 (rating himself as "does not meet" expectations and admitting that the SO Reports for 2010 were completed late).  His subordinates who were deposed in this litigation testified variously that Lassiter was "incompetent," "unfair," inaccessible, "condescending," unprofessional, a "bully," and not a good supervisor. J.A. 599 (Day Dep.); J.A. 639, 643, 654 (Toussaint Dep.); J.A. 755, 759 (Brown Dep.); J.A. 621, 623, 625 (Davis Dep.).  Dr. Carlow described Lassiter as a "constant rambler, and it would take him maybe five or ten minutes to say something that you could say in 20 seconds," and Campopiano testified that "[e]verything took forever for him to discuss."  J.A. 703-04 (Carlow Dep.); J.A. 849 (Campopiano Dep.).

highest possible rating of "Mastery" (defined as "Substantially exceeding standards/objectives. Serves as a role model for others."). J.A. 1074. Despite this glowing review, Shah testified that Lassiter's performance declined. J.A. 520-21 (Shah Dep.). E-mails from the time show that Lassiter continued to miss deadlines, including his staff members' mid-year reviews in September 2011 and the untimely completed SO Reports. J.A. 280, 292; J.A. 192, 200 (Lassiter Dep.). Even though Campopiano did not supervise Lassiter, he requested a meeting to hold Lassiter "accountable."[4] J.A. 521 (Shah Dep.); J.A. 427 (Palomo Dep.); J.A. 1067.

### 4.   October 24, 2011, Meeting

That meeting took place on October 24, 2011 when Shah, Campopiano, and Meghan Palomo (CHOP's Senior Human Resources Business Partner) met to discuss with Lassiter how to put him on the right track in terms of meeting his deadlines and improving his performance. J.A. 427, 431 (Palomo Dep.); J.A. 1067. Palomo knew that Lassiter had just received a fully satisfactory performance evaluation and that, for years, Shah had told Lassiter that he was fully meeting expectations and given him largely positive evaluations, all while complaining about his performance deficiencies. J.A. 433-34, 447 (Palomo Dep.). Recognizing Shah's own deficiency as a manager in giving positive reviews so as to avoid confrontation, Palomo concluded that Lassiter had not been appropriately managed by Shah, and that expectations and consequences for failing to meet those expectations had not been properly established. J.A. 433, 438, 459 (Palomo Dep.).

In his deposition, Shah testified that during the meeting he "thought about" the fact that Lassiter was only in the Supervisor position because of his previous race discrimination lawsuit

---

[4]   *See also* J.A. 292 (E-mail from Campopiano to Shah, Oct. 14, 2011) ("His performance has to change. The perception of him by directors and supervisors is not a positive one. We need him to upgrade his performance.").

against CHOP. J.A. 529 (Shah Dep.). His notes from the meeting reflect that he explained to

Campopiano and Palomo the following:

> [T]his position was given to [Lassiter] when Tim Back resigned because of his
> history of legal actions. After he was hired, AD back then who was in the
> selection committee led by the Medical Director Suresh Shelat, had made a
> comment to me that we all know that he is not the right candidate.

J.A. 1067. Shah testified that he made this comment because he was "nervous" and "worried"

that taking any action against Lassiter would result in him filing another lawsuit against CHOP.[5]

J.A. 512 (Shah Dep.).

As a follow-up to this meeting, Shah, Campopiano, and Palomo implemented an informal

review period to monitor Lassiter's performance, including his adherence to deadlines. The

purpose was to track his progress and to provide feedback and support as necessary. J.A. 426,

459 (Palomo Dep.).[6]

### 5.   Post-Meeting Performance/Pre-PIP

Lassiter continued to miss deadlines after the October 24, 2011, meeting. J.A. 280, 292;

J.A. 192, 200 (Lassiter Dep.). Accordingly, on January 4, 2012, Shah and Campopiano met with

Lassiter, to put him on what the parties have referred to as a "pre-PIP," or pre–Performance

Improvement Plan. Shah and Campopiano provided Lassiter with a memorandum titled

"Management Performance," which identified three areas of concern that required improvement:

(1) management style and approach; (2) communication; and (3) meeting deadlines. J.A. 296-

97; J.A. 205 (Lassiter Dep.). Lassiter admitted he needed to improve upon these areas. J.A. 205

---

[5]   Campopiano had become aware of Lassiter's legal history at some time in the Fall of 2011, when, in a meeting
with Carlow and interim departmental chair Bryan Wolfe, Wolfe mentioned Lassiter's previous lawsuit against
CHOP. J.A. 690-81 (Carlow Dep.).

[6]   During the meeting, the issue of whether Lassiter should receive any form of discipline was not discussed, even
though CHOP had in place a policy, entitled "Rules of Conduct," "to establish rules and guidelines that
communicate . . . performance expectations to employees and discipline that could result from violations of the
Rules of Conduct," J.A. 422-23 (Palomo Dep.); J.A. 1134-47, which set forth procedures for progressive
discipline and corrective action, and there were various categories of action, beginning with general counseling
and culminating in termination. J.A. 422-23 (Palomo Dep.); J.A. 1066; J.A. 1134.

(Lassiter Dep.).  The memo provided that Shah would continue through January, February, and March 2012 to evaluate Lassiter's progress and to "see if a formal Performance Improvement Plan is necessary or not." J.A. 1078.

Lassiter's performance did not improve:

- As of January 27, 2012, Lassiter had not completed an analysis of SO Reports that Campopiano had requested of him in December 2011; when he eventually provided the analysis in February 2012, it was cursory and incomplete.  J.A. 846 (Campopiano Dep.); J.A. 306.  Completion of the SO and MSO reports sometimes fell behind as much as six months.  J.A. 847, 850 (Campopiano Dep.); J.A. 301, 317, 323.

- As of early February 2012, Lassiter still had not provided at least one other assignment to Campopiano that had been started the previous summer, nor had he improved on his communication issues.  J.A. 848-49 (Campopiano Dep.); J.A. 319-20, 322.

- Lassiter was also behind on a thermometer project for Carlow, the purpose of which was to monitor the temperatures of specimens being transported throughout the hospital to ensure specimen integrity.  J.A. 712-14 (Carlow Dep.).  Despite Carlow's reminder to Lassiter to get it done, Lassiter did not complete the project.  J.A. 715 (Carlow Dep.); J.A. 298.

- Meanwhile, Lassiter's staff's dislike of his management style remained. One e-mailed HR on January 11, 2012, to complain that he was a "vindictive" supervisor who "continues to create a hostile environment." J.A. 847 (Campopiano Dep.); J.A. 310-11.

Although Lassiter did not live up to the terms of the management performance memo, neither did Shah who, according to the memo, was supposed to meet individually with each member of Central Lab and with the Administrative Director, but did not, because, in his view, he did not think the meetings were necessary or appropriate given Lassiter's continued poor performance.  J.A. 1078; J.A. 437 (Palomo Dep.); J.A. 542 (Shah Dep.).

### 6.     PIP

On February 9, 2012, to address the continuing problems, and in particular his failure to meet deadlines and his poor communication, Shah placed Lassiter on a formal Performance Improvement Plan ("PIP"), the purpose of which was to improve his work performance through

specific, measurable, believable, and realistic goals.  J.A. 221 (Lassiter Dep.); J.A. 437, 458 (Palomo Dep.); J.A. 324; J.A. 1080-81; J.A. 1095-97.  But Lassiter showed no improvement. J.A. 185 (Lassiter Dep.); J.A. 558 (Shah Dep.); J.A. 808, 853 (Campopiano Dep.); J.A. 438 (Palomo Dep.).  He continued to miss deadlines and deliverables, failed to complete the SO and MSO Reports, and continued to ignore emails from CHOP employees.  J.A. 847, 851 (Campopiano Dep.); J.A. 309; J.A. 715 (Carlow Dep.); J.A. 335-36; J.A. 326, 328-29; J.A. 222-23 (Lassiter Dep.).

Throughout the pre-PIP and PIP processes, Shah met periodically with Lassiter.  J.A. 299, 312, 315, 331, 335, 337; J.A. 205 (Lassiter Dep.).  During these meetings, Shah detailed the projects that were not completed and the deadlines that were missed, including staff evaluations and SO and MSO Reports.  J.A. 299, 312, 315, 331, 334, 337.  In short, Lassiter failed to comply with the PIP.  J.A. 337.

### 7.    Termination

On March 12, 2012, Lassiter was fired from CHOP based on his "inability to perform the job."[7]  J.A. 853 (Campopiano Dep.).  In accordance with CHOP policy, a "Disciplinary Action Notice" or "DAN" was prepared,[8] which identified three reasons for his termination: (1) consistently not meeting deadlines; (2) poor communication with staff and others; no use of ISBARQ; and (3) no improvement during the pre-PIP and PIP.  J.A. 1066.

---

[7]    In his deposition, Shah testified that he agreed Lassiter should be discharged from CHOP "[b]ecause his performance was ineffective and his management style was horrible." J.A. 558 (Shah Dep.).  When asked why he agreed Lassiter should be placed on a pre-PIP, he stated that Palomo suggested it because his 2012 performance review was overrated and she wanted to give Lassiter an opportunity to improve, to set clear expectations, and to meet with him and provide progress notes.  *Id.*  Shah explained that Lassiter was not given a chance to complete the PIP because "[w]hen someone's on PIP, they show some improvement in the beginning, in earlier weeks, that gives the hope that this person's going to improve over the period of PIP.  In Mr. Lassiter's case, he showed no improvement at all during PIP, pre-PIP and PIP." *Id.*

[8]    The DAN in this case was not signed because Shah forgot to give it to Lassiter at the termination meeting. J.A. 426 (Palomo Dep.); J.A. 546 (Shah Dep.); J.A. 1066.

During the termination meeting, Lassiter told Campopiano and Shah that he believed he was improving, reminded them he was dealing with health issues (*see infra*, Section I.A.8), and stated that he could successfully meet his deadlines and complete the PIP if he were given the time called for by the PIP.  J.A. 155 (Lassiter Dep.).

A week later, Lassiter sent a letter to HR requesting to appeal his termination and asserting, *inter alia*, that at his termination meeting: (1) Campopiano told him he "was not on top of [his] game" (a statement Campopiano testified that he did not make); (2) he explained that he was "dealing with health issues" that had required him to take a week off of work; and (3) while he was not completely recovered from illness, he believed he could still successfully complete his review if the period was not cut short.  J.A. 448-49 (Palomo Dep.); J.A. 1092; J.A. 1144.

### 8.    Lassiter's Disability

In the midst of all this, in late 2011, Lassiter informed Shah that he suffered from severe pain as a result of a serious back ailment.  J.A. 387-97.  Shah discussed Lassiter's back pain with him and was aware that Lassiter sometimes left work early to attend physical therapy sessions. J.A. 530-31 (Shah Dep.); J.A. 182 (Lassiter Dep.).

Lassiter contends that during the February 9, 2012, PIP meeting, he asked for time off as an accommodation for his back pain, but Campopiano refused.  J.A. 176-77, 182 (Lassiter Dep.). On or about February 27, 2012, Lassiter told Shah that his doctor had recommended back surgery but that he wanted to try steroid injections first.  J.A. 177 (Lassiter Dep.); J.A. 1109. The following week, Lassiter took three days off of work because of his back (March 7 through March 9, 2012).  J.A. 382.

Lassiter contends that he mentioned his health issues and request for accommodation again in his termination meeting and in his letter requesting appeal.  J.A. 155 (Lassiter Dep.); J.A. 1092.

## III.    LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), is appropriate "where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted).  The moving party must persuade the Court that, "even if all of the inferences which could reasonably be drawn from the evidentiary materials of record were viewed in the light most favorable to the plaintiff, no reasonable jury could find in the plaintiff's favor." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).  To prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) (alteration in original).

## IV.    DISCUSSION

### A.    *Race Discrimination*

Lassiter, an African-American, contends that CHOP discriminated against him on the basis of his race when he was placed on PIP, and later terminated, despite his positive performance reviews and the different treatment afforded to employees outside his protected class.  In Title VII cases, a plaintiff may establish disparate treatment discrimination "either [by] using direct evidence of intent to discriminate or using indirect evidence from which a court could infer intent to discriminate." *Doe*, 427 F.3d at 364.[9]  Lassiter purports to have both direct and indirect evidence of race discrimination.  CHOP, in response, offers several non-

---

[9] Lassiter's claims under Title VII, Section 1981, and the PHRA are analyzed consistently.  *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).

discriminatory reasons for his termination.  For the reasons set forth herein, the motion for summary judgment on this claim is granted.

### 1.    Direct Evidence

Lassiter contends that Shah's "racist statements" at the October 24, 2011 meeting in which CHOP management discussed Lassiter's performance deficiencies constitutes direct evidence of racial bias "expressed by a decision-maker, stated among decision-makers, in a meeting the purpose of which was to take action against [him] and which began the process which culminated in [his] termination."  Opp'n at 24-25.  Given that Lassiter contends that a protected trait was a substantial factor in an adverse employment decision against him, the "mixed motives" test set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (O'Connor, J., concurring) applies.  To survive summary judgment, Lassiter must demonstrate that decision-makers "placed substantial negative reliance on an illegitimate criterion in reaching their decision."  *Connors v. Chrysler Fin. Corp.*, 160 F.3d 971, 976 (3d Cir. 1998); *see also Price Waterhouse*, 490 U.S. at 277.

In the notes Shah prepared following the October 24, 2011 meeting, Shah wrote that he advised Campopiano and Palomo that the supervisory position was given to Lassiter because of his "history of legal actions," and that during the hiring process another member of the committee had stated, "we all know that he is not the right candidate."  J.A. 1067.  Shah's deposition testimony confirmed that, at the time, it was his belief that Lassiter was in the supervisor position because he had previously brought a race discrimination lawsuit.  J.A. 528-29.  Statements made by a person "involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit" are sufficient to shift the burden of persuasion to CHOP, "even if the statements are not made at the same time as the

adverse employment decision . . . ." *Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002), citing *Hook v. Ernst & Young*, 28 F.3d 366 (3d Cir. 1994).

        Lassiter cites *Fakete* in support of his argument that Shah's statements constitute direct evidence of racial bias.  In *Fakete*, the plaintiff had produced evidence that the decision-maker stated he was "looking for younger single people" and that, as a consequence, the plaintiff "wouldn't be happy [at the company] in the future."  308 F.3d at 339.  The Third Circuit found that this statement was sufficient direct evidence of discrimination because it showed that the decision-maker "preferred 'younger' employees and planned to implement his preference by getting rid of [the plaintiff]."  *Id.*

        This case, however, is not on all fours with *Fakete*.  Here, the trier of fact would have to "*infer* the discrimination" from the remarks identified by Lassiter and, as such, they are not direct evidence of discrimination.  *See Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (emphasis in original).   More specifically, Shah's statement referred only to Lassiter's prior lawsuit, not the fact that he was African American.  At Shah's deposition, Lassiter's counsel asked him whether he had "an understanding that . . . there are some people who believe that when they see a black man in a management position that the only reason he's in that position is because he's black[.]"  Shah responded that he had never heard of the concept before, and "thought only qualified person gets the job regardless of race or anything."  J.A. 529.  When pressed to reconcile that statement with his thoughts as stated in the memo that he was not qualified for the position, Shah testified that those thoughts were based in "fear of a previous lawsuit . . . not a generalized statement for every African American."  *Id.*  The Third Circuit has made plain that direct evidence of discrimination is evidence that "would prove the existence of the fact in issue *without inference or presumption*."  *Torre*, 42 F.3d at 829 (emphasis in original).  Lassiter's claim requires an inference be drawn that Shah's fear of legal recourse, based on

Lassiter's prior lawsuit, is tantamount to direct evidence of racial animus; the *Price Waterhouse* framework does not permit such inferences. Lassiter has failed to offer a statement made by a decision-maker that *directly* "reflect[s] a discriminatory or retaliatory animus of the type complained of in the suit." *Fakete*, 308 F.3d at 339. Accordingly, the Court finds that Lassiter has not produced sufficient direct evidence of discrimination.

### 2. Indirect Evidence

In the absence of direct evidence, the burden shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. The burden of proving a prima facie case in the context of this framework is "not onerous." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 986 (1988) (internal citations omitted). To survive a motion for summary judgment, Lassiter must first establish a prima facie case of discrimination by demonstrating by a preponderance of the evidence that he: (1) belongs to a protected class; (2) was qualified for the position; (3) was terminated from his position; and (4) the termination occurred under circumstances that raise an inference of unlawful discrimination. *See Jones v. Se. Pa. Trans. Auth.*, 796 F.3d 323 (3d Cir. 2015); *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n.1, 352, 356, 357 (3d Cir. 1999). The burden then shifts to CHOP to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If CHOP is able to do so, the burden shifts back to Lassiter, who must show that CHOP's articulated reasons were a pretext for intentional discrimination.

CHOP does not dispute that Lassiter has satisfied the first and third elements, *i.e.*, that he belongs to a protected class and that he was terminated from his position. The Court therefore addresses Lassiter's qualifications and the circumstances surrounding his termination.

### a.   Qualifications

CHOP offers a list of specific performance deficiencies and argues that, because Lassiter *performed* poorly in the supervisor position, he was therefore unqualified for it.  Mot. at 27.  CHOP does not specifically contend that Lassiter "lacked the background qualifications for the position at the time he was hired."  *Weldon*, 895 F.2d at 799.  The Court may not interpret "subjective assessments as evidence that [Lassiter] has failed to establish a *prima facie* case," because to do so would improperly "collaps[e] the entire analysis into a single initial step at which all issues are resolved."  *Id*.  Rather, the Court must examine Lassiter's qualifications using objective factors, *i.e.*, whether he possessed the requisite education, experience, or skills for the position from which he was terminated.  *See Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995).

A plaintiff's "satisfactory performance of duties over a long period of time leading to a promotion" can "clearly establish[] his qualifications for the job."  *Jalil v. Avdel Corp*., 873 F.2d 701, 707 (3d Cir. 1989).  In *Jalil*, the district court granted summary judgment in favor of the employer because the plaintiff had committed "unquestionable insubordination" while he held the position from which he was terminated, an act that "made him unqualified" for it.  *Id*.  The Third Circuit reversed, however, holding that insubordination, like other performance issues that may arise after a promotion, is "more logically a defense that is raised at the second level to meet the plaintiff's prima facie case of discrimination," rather than evidence of the plaintiff being unqualified in the first place.  *Id*.; *see also Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005) (qualities like "leadership, productivity and efficiency," or lack thereof, are more appropriately considered "at the second stage of the analysis," and are not "a necessary part of the plaintiff's prima facie case").

16

Here, Lassiter's qualifications included a Bachelor degree in Organizational Management with a minor in Science, more than two decades spent working for CHOP, and two years of specific managerial experience as an Assistant Supervisor.  J.A. 896-97; J.A. 153-54 (Lassiter Dep.).  When the position of Central Lab Supervisor became available, the committee in charge of hiring ranked Lassiter first out of three potential candidates.  J.A. 505-06, 553 (Shah Dep.); J.A. 681-82, 685-86 (Carlow Dep.).  While CHOP claims that Lassiter was simply "not as poor as the other two" applicants (Mtn. at 6), CHOP, having promoted Lassiter "with full knowledge of [his] background, cannot now say that [he] was unqualified for the position;" Lassiter's promotion "was an acknowledgment that [he] was qualified at the time." *Hugh*, 418 F.3d at 268.

Accordingly, the Court finds that Lassiter has met his burden of offering prima facie evidence that he was qualified for the position from which he was terminated.

### b.   Circumstances Giving Rise to an Inference of Discrimination

Turning now to whether Lassiter has adduced sufficient evidence to demonstrate that the circumstances of his firing raises an inference of unlawful discrimination, the Court first notes that the requirements of the prima facie case are "flexible" (*Pivirotto*, 191 F.3d at 357), and an inference of discrimination may be developed "in a number of ways, including, but not limited to, comparator evidence [or] evidence of similar racial discrimination of other employees."  *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).

Lassiter initially offers Campopiano, a Caucasian, as a comparator who, according to Lassiter, was permitted to resign despite engaging in "egregious misconduct," while he, Lassiter, was terminated.  Opp'n at 16, 29.  The record is slight on the nature of Campopiano's alleged misconduct, which apparently involved Campopiano's out of work interactions with employees he supervised.  J.A. 451-52 (Palomo Dep.).  In any event, Campopiano is not a relevant comparator: he held an administrative director position (J.A. 451-52 (Palomo Dep.)), and as

such, his job responsibilities, supervisors, and decision-makers, as well as the nature of the

conduct that led to his separation from CHOP, are entirely dissimilar from Lassiter's.  *See*

*Wilcher*, 441 F. App'x at 882 ("comparator employees must be similarly situated in all relevant

respects"); *see also Pivirotto*, 191 F.3d at 359 (holding that a male employee, who was in-house

counsel to the employer, was not similarly situated to the female plaintiff, who was director of

regional sales operations).

     Lassiter further asserts that no other employee who reported directly to Shah or

Campopiano was placed on PIP or recommended for termination by them.  *Id.*  Yet, Lassiter was

unable to identify a single, similarly-situated employee who engaged in the types of performance-

deficient misconduct cited by the defendant in the record, *i.e.*, nonresponsiveness, missed

deadlines, poor communication, and poor supervision, who was treated differently than he.

Rather than establishing an evidentiary basis for his alleged "different treatment," Lassiter

simply stated his belief that race played a role in his termination: "It's there. . . .  We know it.

And we'll always know it. . . .  I can't believe that any white person in this room can—can feel

the subtle racism that we feel."  J.A. 174.  That belief, as strongly as it may be held, standing

alone, cannot support an inference of discrimination.  *See Wilson v. Blockbuster, Inc.*, 571

F.Supp. 2d 641, 647 (E.D. Pa. 2008) (citing *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d

Cir. 2000)).

     In fact, Campopiano applied his method of holding employees accountable to other

supervisors as well as to Lassiter.  Testimony in the record shows that he treated two white

supervisors—Theresa Vaccaro and Veronica Aurello—in a similar manner.  *See* J.A. 700

(Carlow Dep.) ("I know John Campopiano also came down very, very hard with Theresa

Vaccaro as well and tried to get her on a PIP."); J.A. 701 (Carlow Dep.) ("I do know he did put

at least another supervisor on a PIP, and that was the supervisor of phlebotomy . . . Veronica

Aurello.  So it was a tool that John seemed to be very comfortable with and, you know, good at.").

Lassiter also conceded in his deposition that he had merely assumed he was treated differently,

and had no specific knowledge as to whether, or how, the two white supervisors had been

disciplined.  J.A. 350-52.

Finally, Lassiter points to an incident in which one of his direct reports, Erika Day,

remarked that she believed their lab team was treated differently because it was primarily made

up of African-Americans.  Opp'n at 29; *see also* J.A. 228-30 (Lassiter Dep.); J.A. 340.  One

employee indicated to Lassiter that he found the comment offensive.  J.A. 228-30 (Lassiter

Dep.).  Soon after, Campopiano sent Lassiter an email in which he stated: "I thinks [sic]

something needs to happen as this behavior cannot be condoned."  J.A. 341.  Lassiter interpreted

this email as an order to discipline Day for complaining about discrimination in the workplace.

J.A. 229-31 (Lassiter Dep.).  CHOP, however, contends that Campopiano's email was "a direct

order to assure that there was no discrimination in [Lassiter's] department."  Mtn. at 21; *see also*

J.A. 798 (Campopiano Dep.) (the "behavior" referenced in the email was "the general feeling

that there's racism" in the lab, not the comment itself).  Whatever CHOP's true intentions were

with regard to Day's comment, as Lassiter's subordinate, Day is not an appropriate comparator.

Moreover, while Lassiter claimed in his deposition that CHOP management knew that he agreed

with Day's sentiment, there is no documentation to that effect in the record, and Lassiter

apparently complied with CHOP's directive by reviewing the anti-discrimination policies with

Day and placing a note in her file.  J.A. 228-31, 346 (Lassiter Dep.).

Thus, Lassiter has failed to provide appropriate comparator evidence and relies on his

personal beliefs, assumptions and overly broad characterizations of the evidence in an attempt to

establish circumstances giving rise to an inference of discrimination.  As the Third Circuit has

previously stated, "summary judgment is essentially 'put up or shut up' time for the non-moving

party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).  Based on the foregoing, Lassiter has failed to establish this element of the prima facie case.

A plaintiff is unable to survive summary judgment if the evidence is insufficient to convince a reasonable factfinder to find *all* of the elements of the prima facie case.  *See Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001).  Lassiter has failed to do so here; nevertheless, the Court will address CHOP's stated nondiscriminatory reasons for Lassiter's termination.

### c.  Pretext

CHOP claims that its legitimate nondiscriminatory reasons for Lassiter's termination were that he "routinely ignored requests from his supervisor and other hospital employees, missed deadlines, communicated poorly with his subordinates and others, showed favoritism towards the second shift staff, and was generally viewed as incompetent at performing his job." Mot. at 29.  Once an employer articulates nondiscriminatory reasons for its action, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  The plaintiff must expose "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that "a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer that the proffered nondiscriminatory reasons 'did not actually motivate' the employer's action." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*,

142 F.3d 639, 644 (3d Cir. 1998), quoting *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983

F.2d 509, 513 (3d Cir. 1992).

Here, Lassiter must demonstrate that a fact-finder could reasonably infer that *each* of the

employer's proffered non-discriminatory reasons was "either a *post hoc* fabrication or otherwise

did not actually motivate the employment decision."  *Doe*, 527 F.3d at  370; *see also Ezold*, 983

F.2d at 531 (a "plaintiff does not establish pretext, however, by pointing to . . . commendation of

the plaintiff in categories the defendant says it did not rely upon").  The Court addresses each of

CHOP's proffered reasons, none of which are rebutted with sufficient evidence by Lassiter.

### i.       *Ignoring requests*

Lassiter conceded in his deposition that one of his responsibilities was completing the

mid-year and annual reviews of his staff. J.A. 185 (Lassiter Dep.).  Shah routinely sent emails to

Lassiter about completing the staff reviews on time, but these communications were regularly

ignored and Shah ultimately completed many of these reviews himself.  J.A. 268-80; J.A. 186-92

(Lassiter Dep.).  Lassiter admitted as much in his deposition.  J.A. 187, 189 (Lassiter Dep.).  On

one occasion, a nurse complained to CHOP directors about Lassiter's failures to respond to

requests, citing an instance where Lassiter was contacted about a missing patient specimen but

never responded to the request for assistance in locating it.  J.A. 285-86.  She further detailed

that nurses sometimes did not receive a response from Lassiter, had to follow up with him, and

still would be sent the wrong tubes sometimes days or weeks later.  *Id.*; *see also* J.A. 281-83.

Lassiter ostensibly disputes these statements, but in actuality cites only the fact that the

performance evaluations he received as a supervisor graded him as "Fully Meets" expectations.

He has pointed to no specific evidence that would allow a factfinder to reasonably infer that the

legitimate, nondiscriminatory reason offered by CHOP, that Lassiter ignored requests from his

supervisor and from other employees, was a *post hoc* fabrication or did not otherwise motivate the employment decision.  *See Fuentes*, 32 F.3d at 764.

**ii.      Missing deadlines**

CHOP also asserts that Lassiter routinely failed to timely prepare monthly SO and MSO reports.  J.A. 199-200, 219 (Lassiter Dep.); J.A. 645 (Toussaint Dep.); J.A. 703 (Carlow Dep.).  Lassiter admitted at his deposition that the SO and MSO reports were important to the hospital and that they were his responsibility, but that he routinely completed and submitted them late.  J.A. at 199-201, 219 (Lassiter Dep.) (admitting to a "long delay" in submitting SO and MSO Reports); *see also* J.A. 703 (Carlow Dep.) ("The SO and MSO Reports . . . that is one thing Carl was always, always, always really behind on.").

Again, while Lassiter purports to dispute this fact, in doing so he resorts to what can only be characterized as hair-splitting.  He argues that CHOP "implies that completing the send-out reports on a monthly basis was one of [his] essential job functions," but the task was "not included among the responsibilities listed in [his] job description," and it "was not chief" among his responsibilities.  *See* Pl.'s Response Facts ¶ 43.  Whether or not the SO and MSO reports were a "chief" responsibility of Lassiter's, he admitted that they were his responsibility and that he was routinely late in both completing and submitting them.  J.A. 199, 219-26, 360-61 (Lassiter Dep.).  Lassiter has provided no evidence to show that his routine failure to miss deadlines, as proffered by CHOP, was a *post hoc* fabrication or did not otherwise actually motivate the employment decision.

**iii.      Poor communication**

Several staff members from Central Lab and other labs, as well as managers, supervisors from other departments, and technicians from other departments, made complaints about Lassiter's performance, his attitude, the way he spoke to them, and the things that he said to

22

them.  CHOP secured testimony from several of Lassiter's subordinates—Julio Toussaint, Erika Day, Nicole Davis, and Cecily Brown—that characterized Lassiter's management style as "condescending," and described him as a "bully" who "picked on" staff members.  J.A. 755 (Brown Dep.); J.A. 621 (Davis Dep.); J.A. 639, 643 (Toussaint Dep.).  Lassiter was also a "constant rambler."  J.A. 703-04 (Carlow Dep.).  Campopiano testified that "[e]verything took forever for him to discuss," and Carlow noted that a comment that should have taken twenty seconds would instead last five to ten or twenty minutes.  J.A. 849 (Campopiano Dep.); J.A. 703 (Carlow Dep.).  Carlow further testified that he "would sometimes have to stop [Lassiter's] rambling and just get him to be direct and just focus." J.A. 704 (Carlow Dep.).

Lassiter's characterization that these criticisms are somehow "post-litigation" or "after-the-fact" is belied by the evidence in the record.  Opp'n at 21.  Lassiter's difficult interactions and communication with staff were addressed in the pre-PIP and the PIP, and he readily acknowledged this at his deposition.  J.A. 204-05; 226 (Lassiter Dep.).  Lassiter's issues extended as far back as a 2006–07 review which warned Lassiter to "be careful that conversations do not become too lengthy and remain straight to the point," and identified his communication with lab assistants as an area for improvement.  J.A. 1038.  The matter was raised again in Lassiter's 2007–08 performance review, which specifically cautioned Lassiter that he should "be mindful of not lecturing and talk[ing] down to staff."  J.A. 1036.  In discussing the January 4, 2012, "Management Performance" memorandum from Shah, Lassiter agreed that the first performance issue mentioned was "management style and approach to staff," specifically, the way he would handle a conversation when he met with staff to discuss an error or disciplinary issue.  J.A. 205 (Lassiter Dep.) (Q: "Do you remember that being an issue you were told about and needed to improve upon?" A: "Yes."); J.A. 296 (identifying "management style

and approach to staff" as an area of concern); J.A. 324 ("Employee fails to treat the staff in a way that is supportive of the hospital's approach to positive management.").

The record also contains an email complaint from Cecily Brown to Palomo, dated January 11, 2012, in which she stated, "All of [Lassiter's] supervisory actions towards us are vindictive and he continues to create a hostile work environment." J.A. 311.

Lassiter attempts to refute these contentions by pointing to a statement from Carlow's deposition that, to him, Lassiter "seemed well liked" by his colleagues. J.A. 686 (Carlow Dep.). Read in context, however, Carlow's testimony reflects his "general sense" that Lassiter was well-liked by his staff when he was assistant supervisor, *prior* to his promotion to the position at issue in this litigation. *See e.g.*, J.A. 643 (Toussaint Dep.) ("I thought Carl was an excellent coworker. Before he was a supervisor, I thought he was intelligent, respectful to me, but when he became a supervisor, I just—I don't think—I don't think he was the right guy for it").

Accordingly, Lassiter has failed to show that his poor communication with subordinates and other employees was a *post hoc* fabrication by CHOP or did not otherwise actually motivate the employment decision.

### iv. Incompetence

Finally, CHOP contends that the uncontroverted record evidence shows that Lassiter's subordinates, colleagues, and supervisors found him to be incapable in all aspects of his job performance. In Brown's deposition, she agreed that she "personally observed Mr. Lassiter's incompetency at work," and that "almost everything [she] saw Mr. Lassiter do as a supervisor was not right." J.A. 764 (Brown Dep.). She further testified:

Q:  What was the assessment of Mr. Lassiter based upon your conversations from the people he supervised, what was the assessment?

A:  He didn't know what he was doing. Like he didn't come out to help us. He didn't start coming out into the lab to do work until the second shift when Janelle

got there.  And then once we all noticed that, then he waited until the 3:30 people
left and he started coming out after that.

J.A. 759-60 (Brown Dep.).  Toussaint testified as follows:

> Q:  Did you consider Carl Lassiter a competent supervisor?
>
> A:  No.
>
> Q:  Why?
>
> A:  Unfortunately.  Just because I would—to me, I would judge it by, maybe
> unfairly, but I would judge it by the reaction of the staff, how the staff feels about
> him, how the work is getting done or things like that, how many issues we have
> and stuff like that, kind of all that—all that stuff.  And I felt like I was doing a lot
> of the work.  I was doing—put it this way, I was doing a lot of work that I felt
> either he should be doing.  And I brought it to his attention and to Vipul's
> attention and—so I feel if that—if I'm doing it, then that means he's not doing it
> or somebody's not doing it, and to me, that's not a sign of a good supervisor.

J.A. 643 (Toussaint Dep.).  Another one of Lassiter's reports agreed that he "str[uck] [her] as an

incompetent supervisor," testifying that "he just wasn't in the lab.  And when it was time for

issues or problems, like I said, he just never addressed them."  J.A. 599 (Day Dep.).  Likewise,

Shah believed Lassiter should be discharged from CHOP "[b]ecause his performance was

ineffective and his management style was horrible."  J.A. 558 (Shah Dep.).  When asked why he

agreed Lassiter should be placed on a pre-PIP, Shah testified that Palomo had suggested it

because Lassiter's 2012 performance review was overrated, and she wanted to give him an

opportunity to improve, set clear expectations, meet with him, and provide progress notes.  *Id.*

Lassiter repeatedly emphasizes that every performance evaluation he received as a

supervisor prior to being placed on PIP was positive.  *See* J.A. 1068-77, 942-66, 515-16.

Certainly, a lack of criticism of an employee's performance can be relevant to a pretext analysis.

In *Sempier v. Johnson & Higgins*, 45 F.3d 724 (3d Cir. 1995), for example, the employer stated

that the plaintiff was terminated because of poor performance, but the evidence indicated that:

(1) the plaintiff never received any unfavorable reviews; and, (2) the employer adduced no other

evidence of poor performance or made specific allegations of his deficiencies.  *Id.* at 731-33.
There, the Third Circuit found that there was ample evidence on the record for a jury to conclude
that the employer's failure to admonish the plaintiff in the twenty years prior to his termination
"makes suspect its *post hoc* assertions of poor performance," especially when the employer
failed to produce any other evidence of poor performance or make specific allegations of the
plaintiff's deficiencies.  *Id.* at 731.

     Here, there is no question that CHOP's management of Lassiter was far from stellar:
While he consistently received positive reviews throughout his nearly three decades of
employment with CHOP, and, prior to February 9, 2012, was never placed on a PIP or subject to
disciplinary measures in any of his roles (J.A. 515 (Shah Dep.)), the record shows that his
positive evaluations came despite documented unsatisfactory performance, an unfortunate
discrepancy that was due to "a poor management choice on behalf of Shah." J.A. 447 (Palomo
Dep.).  Palomo testified that she had no reason to believe that it was motivated by anything other
than Shah's desire to avoid an uncomfortable conversation, a management failure that had been
brought to Shah's attention.  J.A. 926 (Shah needs to improve "manag[ing] his supervisors" and
"not just accept[] past poor management performance as acceptable"); *see also* J.A. 921 ("[Shah]
needs to take a more active role in the difficult areas where his supervisors need to be actively
managed and given feedback. . . .  Past behavior/performance cannot be accepted in the future.").
Moroever, CHOP has made several specific allegations concerning his deficiencies, and has
supported each of these with evidence.

     While CHOP's decision to continually provide positive reviews to an underperforming
employee may have been imprudent, the Court's role is not to determine "whether the employer
made the best or even a sound business decision," but "whether the real reason [for the adverse
action] is discrimination." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 468 (3d Cir. 2005); *see also*

*Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 261 (3d Cir. 2013) ("the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent").

Lassiter has been unable to identify evidence with "sufficient probative force that a factfinder could conclude by a preponderance of the evidence that [race] was a motivating or determinative factor in the employment decision." *Simpson*, 142 F.3d at 644-45. The Court therefore concludes that Lassiter has failed to show that CHOP's proffered legitimate nondiscriminatory reasons for his termination were fabricated or that unlawful discrimination was a motivating factor in the decision to terminate him. Accordingly, CHOP's motion for summary judgment on Lassiter's race discrimination claim shall be granted.

## B.    *Retaliation*

In addition to his race discrimination claim, Lassiter also alleges that he was terminated in retaliation for engaging in Title VII protected activities, *i.e.*, filing a race discrimination lawsuit against CHOP in 2005 ("*Lassiter I*") and agreeing with a subordinate's remark about race discrimination against the lab team. Opp'n at 31; *see also supra* at IV.A.2.b. The anti-retaliation provision of Title VII forbids employer actions that discriminate against an employee because he has "'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59-60 (2006), quoting 42 U.S.C. § 2000e–3(a). Although CHOP does not dispute that Lassiter engaged in protected Title VII activities, it does contend that he cannot succeed on his retaliation claim because *Lassiter I* was filed more than six years before the adverse employment action at issue in this litigation, and because the "racially insensitive comment" made by Lassiter's subordinate cannot be the basis for a retaliation claim because Lassiter's performance problems preceded the comment. Mot. at

35-39.   Thus, to maintain his retaliation claim, Lassiter must demonstrate that "after or contemporaneous with that protected activity, he was subject to a materially adverse employment action; and [that] a causal connection existed between the protected activity and the adverse employment action."  *Lebofsky v. City of Phila.*, 394 Fed. App'x. 935, 938 (3d Cir. 2010) (footnote omitted), citing *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).  The "mere passage of time is not legally conclusive proof against retaliation."  *Robinson v. Se. Pa. Transp. Auth.,* 982 F.2d 892, 894 (3d Cir.1993).

While *Lassiter I* was filed approximately six years before the PIP, it is apparent that Shah's preoccupation with Lassiter's protected activity extended from the conclusion of *Lassiter I* in 2008 until Lassiter's termination in 2012.  J.A. 530-39 (Shah Dep.).  At his deposition, Shah confirmed his belief that Lassiter had the supervisor position because he had previously brought a race discrimination lawsuit, and that he treated Lassiter differently because he feared he would file another lawsuit against CHOP.  J.A. 506 ("[T]here was also his previous lawsuit, so people were kind of nervous about not giving the job. . . .  That if he doesn't get a job, there will be another lawsuit that he could file."), 509-10, 512, 528-29 (Shah Dep.).  And, it was in the October 2011 meeting, when management discussed getting Lassiter "on the right track", Mtn at 14; *see also* J.A. 426, 459 (Palomo Dep.), that Shah informed the other decision-makers that Lassiter got his job "because of his history of legal actions," even though "we all know that he is not the right candidate."  J.A. 1067; *see also* J.A. 512 (Shah Dep.).  The record shows that Shah was not alone in having the fact of Lassiter's lawsuit top of mind in the fall of 2011.  More specifically, departmental chair Bryan Wolfe mentioned Lassiter's previous lawsuit against CHOP in a meeting with Carlow and Campopiano in that time period.  J.A. 690-81 (Carlow Dep.).  Thus while a significant amount of time had elapsed between *Lassiter I* and the "racially insensitive comment" on the one hand and, on the other hand, the informal review period during

28

which Lassiter was closely monitored then placed on a PIP, a process which ultimately lead to his termination in March 2012, evidence gleaned from the record as a whole is sufficiently suggestive of a causal connection between Shah's protected activity and the adverse employment decisions made by CHOP.  *See Krouse v. American Sterilizer Co.*, 126 F.3d 494 (3d Cir. 1997); *see also Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000) (trier of fact may infer a causal connection from "evidence gleaned from the record as a whole").  Shah's preoccupation with Lassiter's protected activity, and CHOP's decision to finally take corrective action immediately following the October 2011 meeting, where it had previously tolerated—apparently for years—Lassiter's subpar performance, are sufficient for a reasonable factfinder to find that retaliation was unusually suggestive of retaliatory motive.

The Court therefore finds that Lassiter has shown there is a genuine issue of material fact as to whether retaliatory animus was a motivating factor for the adverse employment actions. Once a plaintiff shows that such a genuine issue of material fact exists, the burden of production and persuasion shift to the defendant, and summary judgment should ordinarily be denied.  *See Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir. 1994); *Venters v. City of Delphi*, 123 F.3d 956, 973 n.7 (7th Cir. 1997) ("once the plaintiff has presented evidence reasonably suggesting that [an impermissible animus] played a motivating role in [his] discharge, summary judgment will rarely (if ever) be appropriate . . .").  Accordingly, CHOP's motion for summary judgment on Lassiter's retaliation claim is denied.

### C.    *Disability Discrimination*

Turning to Lassiter's third and final claim, Lassiter asserts that CHOP violated the ADA and PHRA by failing to accommodate his disability, a back injury, and by terminating him after

he took time off work because of that injury.[10]  He argues that CHOP ignored his health issues

and requests for assistance, and demonstrated disability-based animus when Campopiano told

Lassiter that he was "not at the top of his game."  Opp'n at 40.  The Court addresses each claim

in turn.

### 1.  Failure to Accommodate

Discrimination under the ADA "encompasses not only adverse actions motivated by

prejudice and fear of disability, but also includes failing to make reasonable accommodations for

a plaintiff's disabilities."  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)

(citation and internal quotation marks omitted); *see also* 42 U.S.C. § 12112(b)(5).  For a

defendant to be found liable for discrimination on the basis of a failure to accommodate, a

plaintiff must prove: "(1) he is a disabled person within the meaning of the ADA; (2) he is

otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodations by the employer; and (3) he has suffered an otherwise adverse employment

decision as a result of discrimination . . . [which] in this context include[s] refusing to make

reasonable accommodations for a plaintiff's disabilities."  *Hohider v. United Parcel Serv.*, 574

F.3d 169, 186 (3d Cir. 2009) (citations and internal quotation marks omitted).  CHOP does not

specifically dispute that Lassiter had a disability.

In arguing that Lassiter was unqualified, CHOP refers again to his performance

deficiencies, essentially repeating the argument made regarding his qualifications in the race

discrimination context.  Mtn. at 33.  An employee is a qualified individual if he (1) "has the

requisite skill, experience, education and other job-related requirements" and (2) "with or

without reasonable accommodation, can perform the essential functions of that position."  *Turner*

---

[10]  The Third Circuit's analysis of ADA claims applies equally to PHRA claims.  *See Kelly v. Drexel Univ.*, 94 F.3d
102, 105 (3d Cir. 1996).

*v. Hershey Chocolate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006), citing 29 C.F.R. § 1630.2(n).  As discussed previously (*supra* at IV.A.2.a), unless this Court were to infer that CHOP would promote to supervisor a person who did not have the requisite skill, experience, education, and job-related requirements for the position, this argument fails.  *See Taylor*, 184 F.3d at 311.

As to the accommodation, Lassiter "must show, as part of [his] burden of persuasion, that an effective accommodation exists that would render [him] otherwise qualified."  *Walton v. Mental Health Ass'n*, 168 F.3d 661, 670 (3d Cir. 1990).  Reasonable accommodation "includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith. . . ."  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004).  According to his deposition testimony, the accommodation that Lassiter requested for his back pain was some time off of work, because the pain made it difficult for him to do his job without breaks.  J.A. 176-77, 182 (Lassiter Dep.).  The record evidence indicates that Shah was aware that Lassiter was already leaving work early to attend physical therapy sessions and that Lassiter had taken several days off work in early March 2012 because of back pain.  J.A. 182 (Lassiter Dep.); J.A. 531, 550 (Shah Dep.); J.A. 382.  Lassiter requested accommodation on three occasions: in the meeting in which he was placed on the PIP, in the meeting at which his employment was terminated, and in his letter requesting a formal appeal.  J.A. 176-77, 182 (Lassiter Dep.).

Assuming, *arguendo*, that Lassiter's proposed accommodation was reasonable, acquiescing to his request at any of these three points would have required CHOP to excuse Lassiter's previous performance deficiencies.  When an employee requests an accommodation only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late.  The ADA does not mandate that an employer excuse an employee's previous misconduct, even if it was precipitated by his or her disability.  *Jones v. Nationwide Life Ins. Co.*,

696 F.3d 78, 90 (1st Cir. 2012); *see also* EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the ADA 35-36 (2002) ("[S]ince reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability.").[11]

CHOP's reasons for seeking to terminate Lassiter's employment based on his performance deficiencies have been discussed at length throughout this Opinion (*see* IV.A.2.c). The ADA does not require CHOP to have provided retroactive accommodation that would amount to Lassiter being absolved of such misconduct.  Thus, Lassiter has failed to establish unlawful denial of accommodation as a matter of law.

## 2.    Disparate Treatment

Lassiter further claims that CHOP's reasons for firing him were a pretext for invidious discrimination on the basis of his disability.  Pretext cases under the ADA are analyzed under the *McDonnell Douglas* burden-shifting framework.  A plaintiff must establish that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998).  The burden then shifts to the defendant to provide a legitimate nondiscriminatory reason for its action.  If the defendant meets that burden, the plaintiff must show that the proffered reasons are mere pretext for unlawful discrimination.  *See Fuentes*, 32 F.3d at 764.

---

[11] Although there is no Third Circuit guidance directly on point, this premise is well-settled in other courts.  *See e.g.*, *Davila v. Quest Corp.*, 113 F. App'x 849, 854 (10th Cir. 2004); *Brown v. Lucky Stores, Inc.*, 246 F.3d 1182, 1187 (9th Cir. 2001); *Pernice v. City of Chicago*, 237 F.3d 783, 785 (7th Cir. 2001); *Hill v. Kansas City Area Trans. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999); *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999); *Hamilton v. Sw. Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998); *accord Willis v. Norristown Area Sch. Dist.*, 2 F.Supp. 3d 597 (E.D. Pa. 2014); *Heard v. St. Luke's Hosp.*, 2009 WL 3081513 (E.D. Pa. Sept. 28, 2009).

Even assuming, *arguendo*, that Lassiter has presented a prima facie case of disparate treatment discrimination based on his disability, he has not adduced evidence to establish pretext. In the section of Lassiter's brief that contains the pretext argument on this claim, he states only, "[t]here is compelling evidence of pretext," and refers to his argument discussing pretext in regards to his race discrimination claim.  *See* Opp'n at 40.  Notably, CHOP was already moving to take action regarding Lassiter's employment in October 2011, well before Lassiter requested an accommodation.  The Court has found that that evidence was insufficient to establish pretext in the race discrimination context (*see* IV.A.2.c), and that conclusion does not change when the evidence is viewed in the disability context.  Thus, CHOP's motion for summary judgment on this claim is granted.

An appropriate Order follows.

Dated:  **September __, 2015**

**BY THE COURT:**

**/S/WENDY BEETLESTONE, J.**

_____

**WENDY BEETLESTONE, J.**